# No. 24-12907

# United States Court of Appeals

### *for the*

# Eleventh Circuit

———

JAMES TERYL,

*Plaintiff/Appellant,*

— v. —

FEDEX FREIGHT, INC.,

*Defendant/Appellee.*

———

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
CASE NO: 2:21-cv-01395-CLM (Hon. Corey L. Maze, U.S. District Judge)

# ANSWER BRIEF OF APPELLEE
# FEDEX FREIGHT, INC.

Donald H. Snook
FEDERAL EXPRESS CORPORATION
8285 Tournament Drive
Memphis, Tennessee 38125
(901) 434-3183

Richard J.R. Raleigh, Jr.
WOMBLE BOND DICKINSON (US) LLP
200 West Side Square, Suite 950
Huntsville, Alabama 35801
(256) 834-8661

*Counsel for Appellee*

CP COUNSEL PRESS     (800) 4-APPEAL • [130973]

*Teryl James v. FedEx Freight, Inc.*
No. 24-12907

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 21-1 and 26.1-1, Defendant-Appellee herby identifies the following persons and entities which have, or may have, an interest in the outcome of this case within the meaning of the rules:

1.    FedEx Freight, Inc., Appellee

2.    Fisher, Samuel, counsel for Appellant

3.    Jackson, Sidney M., counsel for Appellant

4.    James, Teryl, Appellant

5.    Lawsen, Nicki L., counsel for Appellant

6.    Maze, Hon. Corey L., Judge, United States District Court for the Northern District of Alabama.

7.    Raleigh, Jr., Richard J.R., counsel for Appellee, FedEx Freight, Inc.

8.    Snook, Donald H., counsel for Appellee, FedEx Freight, Inc.

9.    Wiggins Childs Pantazis Fisher & Goldfarb, LLC, counsel for Appellant

10.    Womble, Bond, Dickson, LLP counsel for Appellee

Under Eleventh Circuit Rule 26.1-3(b), FedEx Freight, Inc. disclosed it is a wholly owned subsidiary of Federal Express Corporation which is a wholly owned subsidiary of FedEx Corporation. FedEx Corporation is a publicly traded corporation and no publicly held corporation owns ten percent or more of its stock.

/s/ Donald H. Snook

C-1 of 1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee believes that the District Court's Order granting summary judgment is well reasoned and a correct statement of the law. Further, the legal issues are straightforward. The record on appeal speaks for itself. Oral Argument is unnecessary.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE AND FACTS ..................................................2

    Course of Proceedings and Disposition in the District Court .........................2

    Statement of Facts....................................................................................3

    I.      James' Employment with FXF.................................................3

    II.    James' Alleged Notice Regarding Wife's High-Risk Pregnancy ..............................................................................4

    III.   James' Alleged Requests to Leave Early ...................................5

    IV.   James' Alleged Requests to Leave Work Due to Wife's Pregnancy ..............................................................................6

        A.    Week of June 22, 2020......................................................6

        B.    "Couple of Days Later" .....................................................7

    V.    James' Non-Compliance with FXF Attendance Policy & Expectations ..............................................................................8

    VI.   James' June 25, 2020 Corrective Action (Coaching) .....................9

    VII.  James' Termination .................................................................10

STANDARD OF REVIEW .......................................................................12

SUMMARY OF THE ARGUMENT ........................................................14

ARGUMENT ......................................................................................17

ii

I.    The District Court did not abuse its discretion in determining Plaintiff failed to comply with the Federal Rules of Civil Procedure and the Court's Orders ........................................................17

II.   James cannot defeat summary judgment by asserting new claims not pled in his complaint...........................................................20

III.  The District Court properly held that there was no genuine issue of material fact regarding James' FMLA Claims .....................22

      A.   James cannot show entitlement to FMLA leave prior to the birth of his child ................................................................22

      B.   FXF did not interfere with James' Rights under the FMLA or engage in retaliation ................................................24

      C.   Any alleged interference with time off was a technical violation and did not prejudice James........................................26

IV.   The District Court properly held that there was no genuine issue of material fact regarding whether FXF disciplined James because of an anti-FMLA leave motive or intent.....................29

V.    James cannot show that FXF's legitimate, non-discriminatory reason for termination was a pretext for retaliation ............................31

VI.   The District Court properly held that James was not qualified for the job at the time of his termination.............................................35

CONCLUSION ........................................................................................38

CERTIFICATE OF COMPLIANCE........................................................40

CERTIFICATE OF SERVICE ................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alvarez v. Royal Atl. Devs.*, Inc.,
    610 F.3d 1253 (11th Cir. 2010) ..........................................................35

*Arnold v. Tuskegee Univ.*,
    No. 06-11156, 2006 U.S. App. LEXIS 31476 (11th Cir. Dec. 19, 2006) ..........34

*Balogh's of Coral Gables, Inc. v. Getz*,
    789 F.2d 1356 (11th Cir. 1986) ............................................14, 18, 19

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)..........................................................32

*Brooks v. Cty. Comm'n of Jefferson Cty.*,
    446 F.3d 1160 (11th Cir. 2006) ..................................................32

*Burrage v. United States*,
    571 U.S. 204 (2014)..............................................................32

*Cave v. Singletary*,
    84 F.3d 1350 (11th Cir. 1996) ..................................................13

*Chapman v. AI Transp.*,
    229 F.3d 1012 (11th Cir. 2000) .......................................... 31-32, 35

*Clark v. Housing Auth. of Alma*,
    971 F.2d 723 (11th Cir. 1992) ..................................................18

*Commercial Union Ins. Co. v. Sepco Corp.*,
    918 F.2d 920 (11th Cir. 1990) ..................................................13

*Cruz v. Publix Super Mkts., Inc.*,
    428 F.3d 1379 (11th Cir. 2005) ..................................................22

*Daughtery v. Mikart, Inc.*,
    205 F. App'x 826 (11th Cir. 2006) ..........................................13, 21

*Den Hartog v. Wasatch Academy*,
    129 F.3d 1076 (10th Cir. 1997) ..................................................38

*Flowers v. Troup County*,
    803 F.3d 1327 (11th Cir. 2015) ..................................................32

iv

*Gay v. Gilman Paper Co.*,
   125 F.3d 1432 (11th Cir. 1997) .........................................................23

*Gilmour v. Gates, McDonald & Co.*,
   382 F.3d 1312 (11th Cir. 2004) ...................................................20, 21

*Graham v. State Farm Mut. Ins. Co.*,
   193 F.3d 1274 (11th Cir. 1999) .........................................................27

*Hairston v. Gainesville Sun Pub. Co.*,
   9 F.3d 913 (11th Cir. 1993) ...............................................................13

*Herren v. La Petite Acad., Inc.*,
   No. 22-11499, 2023 U.S. App. Lexis 19524,
   2023 WL 4842346 (11th Cir. July 28, 2023) ....................................33

*Hilburn v. Murata Elecs. N. Am., Inc.*,
   181 F.3d 1220 (11th Cir. 1999) ..........................................35, 36, 38

*Hurlbert v. St. Mary's Health Care Sys., Inc.*,
   439 F.3d 1286 (11th Cir. 2006) ............................................20, 21, 22

*Jackson v. Veterans Admin.*,
   22 F.3d 277 (11th Cir. 1994) .............................................................36

*Jones v. Gulf Coast Health Care of Delaware, LLC*,
   854 F.3d 1261 (11th Cir. 2017) .........................................................31

*King v. Preferred Tech. Grp.*,
   166 F.3d 887 (7th Cir. 1999) .............................................................31

*Lapham v. Walgreen Co.*,
   88 F.4th 879 (11th Cir. 2023) ...........................................................32

*Lucas v. W.W. Grainger, Inc.*,
   257 F.3d 1249 (11th Cir. 2001) ...................................................13, 36

*Mann v. Taser Int'l, Inc.*,
   588 F.3d 1291 (11th Cir. 2009) ...................................................18, 19

*Martin v. Brevard Cnty. Pub. Sch.*,
   543 F.3d 1261 (11th Cir. 2008) .........................................................25

*Matter of Chicago, Rock Island and Pacific R.R. Co.*,
   865 F.2d 807 (7th Cir. 1988) .............................................................13

v

*McCarroll v. Somerby of Mobile, LLC*,
  595 Fed. Appx. 897 (11th Cir. 2014)....................................................25

*Nolen v. Boca Raton Community Hosp., Inc.*,
  373 F.3d 1151 (11th Cir. 2004) .........................................................13

*O'Connor v. PCA Family Health Plan, Inc.*,
  200 F.3d 1349 (11th Cir. 2000) .........................................................24

*Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar System Inc.*,
  541 F.3d 1278 (11th Cir. 2008) ..................................................... 12-13

*Ragsdale v. Wolverine World Wide, Inc.*,
  535 U.S. 81, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002) ...................................27

*Ramji v. Hosp. Housekeeping Sys., LLC*,
  992 F.3d 1233 (11th Cir. 2021) ..................................................28, 29

*Reese v. Herbert*,
  527 F.3d 1253 (11th Cir. 2008) ..................................................18, 19

*Sparks v. Sunshine Mills, Inc.*,
  580 Fed. Appx. 759 (11th Cir. 2014)....................................................23

*Strickland v. Water Works & Sewer Bd.*,
  239 F.3d 1199 (11th Cir. 2001) ...........................................24, 30, 31

*Taylor v. On Tap Unlimited, Inc.*,
  No. 07-14493, 2008 U.S. App. LEXIS 13543 (11th Cir. June 24, 2008) ..........34

*White v. Beltram Edge Tool Supply, Inc.*,
  789 F.3d 1188 (11th Cir. 2015) ..................................................21, 22

## Statutes and Other Authorities

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

29 U.S.C. § 2617 ...................................................................27

29 U.S.C. § 2617(a)(1)(A)(i) .......................................................27

Fed. R. Civ. P. 56 .................................................................17

Fed. R. Civ. P. 56(c)......................................................1, 19, 38

Fed. R. Civ. P. 56(c)(1)........................................................14, 17

vi

## STATEMENT OF JURISDICTION

The District Court had jurisdiction based on 28 U.S.C. § 1331, which provides a district court with original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States. This Court has jurisdiction under 28 U.S.C. § 1291 to review issues set forth in the final Order entered on July 29, 2024. (Doc. 64).[1]

## STATEMENT OF THE ISSUES

**A.** Did the District Court abuse its discretion by finding that Appellant did not comply with the Court's Initial Order or FRCP 56(c) by failing to controvert Appellee's Statements of Fact?

**B.** Did the District Court err by finding that James' FMLA "Employer Notice" claim, which was not pled in James' Complaint, resulted in no prejudice to James, and should James be allowed to pursue an unpled claim?

**C.** Did the District Court err by finding that there was no genuine issue of material fact with regard to James' claim of interference under the FMLA?

**D.** Did the District Court err by finding that there was no genuine issue of material fact with regard to James' claim of retaliation under the FMLA?

---

[1] **Note on Citations:** Citations to the record below are made using the District Court's ECF "Doc." number and pagination of the ECF document. Citations to filings before this Court are made in a similar manner using "Appeal Doc." for this Court's ECF document number and pagination.

**E.**    Did the District Court err by finding that James was not "qualified" under the ADA and thus there was no genuine issue of material fact regarding James' claim for Associational Disability?[2]

## STATEMENT OF THE CASE AND FACTS

### Course of Proceedings and Disposition in the District Court

On October 19, 2021, Plaintiff-Appellant Teryl James ("James") filed a civil action against Defendant-Appellee FedEx Freight, Inc. ("FXF"), his former employer, seeking damages based on FXF's alleged violations of the Family Medical Leave Act ("FMLA"), Race Discrimination and Retaliation in violation of Title VII, violations of §504 of the Rehabilitation Act and the American with Disabilities Act. FXF moved for Summary Judgment on September 14, 2023. After further briefing by the Parties, on July 29, 2024, United States District Court Judge Corey Maize entered an order granting summary judgment in favor of FXF and terminated the case. On August 12, 2024, FXF moved for an Order of Costs against James in the amount of $4603.70. On August 27, 2024, James filed a Notice of Appeal, which is presently before the Court.

---

[2] Appellant has abandoned his claim for race discrimination and did not address this claim in the Appellant's Opening Brief. Therefore, Appellee has not identified any issues for this claim.

**Statement of Facts**

## I.    James' Employment with FXF

At all relevant times, James worked for FXF as a Freight Handler. (Doc. 39-2, p. 1 lines 1-16). A Freight Handler unloads and loads trailers on the dock according to instructions provided by Operations Supervisors at the dock stand. (Doc. 39-1, p. 35 lines 7-15, 21-23 and p. 36 lines 6-23 through p. 37 lines 1-6; Doc. 39-6, p. 136 2-23 through p. 138 lines 1-7).

Once a trailer is completed, Freight Handlers report to the dock stand for another assignment. (Doc. 39-6, p. 136-137). This process is repeated until the trailers are emptied and loaded for the next destination. (*Id.*)  At the end of the night, Freight Handlers check-in with the supervisor at the dock stand to confirm they have no more assignments and that they can go home. (*Id.*) James usually began his shift at 5:30 pm and typically ended the following morning at 2:30 am. (Doc. 39-1, p. 39, lines 20-23 through p. 40 lines 1-8). According to James, in March of 2020 he told his supervisors (Sadiou Macalou, Damion Coleman, and Rickey Albert) that his wife was pregnant. (Doc. 39-2, p. 17-19 lines 1-13). He claims that he asked about FMLA and was told to wait until closer to the time of the delivery to complete the paperwork. (Doc. 39-2, p. 21 lines 6-18). James understood this because his wife's due date in September was still six months away. (*Id.*).

However, on July 7, James informed his management that his wife had gone into early labor and requested parental leave, which was granted with an effective date of July 6, 2020. (Doc. 39-10, p. 4).

## II.    James' Alleged Notice Regarding Wife's High-Risk Pregnancy

James claims that in June of 2020 he informed his supervisors, Sadiou Macalou and Rickey Albert, that his wife's pregnancy was "high risk." (Doc. 39-2, p. 22).[3] James testified that he told Macalou that his wife would have "to be taken to the hospital more, to the doctor more." (*Id.* at p. 23 lines 4-6). Mr. Macalou responded to James' request and said, "you need to take care of your family." (Doc. 39-2, p. 28 lines 16-23). James also testified that Rickey Albert, the Service Center Manager, told him on those days he needed to tell the supervisors that he needed to leave early. (Doc. 39-2, p. 28 lines 22-23 through p. 29 lines 1-5). James also testified that he wanted to leave early frequently "to get home to be with his wife" even on days that she did not have any appointments. (Doc. 39-3, p. 4 lines 22-23 through p. 5 lines 1-21).

---

[3] Although FXF supervisors deny James reported any need for time off due to his wife's "high risk" pregnancy, and the District Court deemed FXF's facts as true, it also deemed James' properly supported factual contentions as true. The District Court assumed the truth of this contention.

### III.    James' Alleged Requests to Leave Early

James failed to provide evidence of any specific days he needed to leave work to take his wife to appointments or otherwise care for her. James could not (and would not) identify specific dates and times of any of his wife's doctor appointments. (Doc. 39-3, p. 15-19 lines 1-6).[4] Moreover, James does not claim that his wife missed any appointments or treatment or otherwise lacked care because he could not leave work at a certain time. James only alleges that his wife had three or four appointments that he needed to take her to and that his supervisors did not permit him to leave one hour early. (Doc. 39-3, p. 15 lines 15-22.).  James testified in his deposition that he had agreements with his supervisor to leave at 1:30 or 1:40. (Doc. 39-3, p. 16 lines 21-23 through p. 18 lines 1-19). On other occasions he simply wanted to leave early to get home to his wife. (Doc. 39-3, p. 4 lines 22-23 p. 5 lines 1-21).

James testified that his wife's appointments were "every other week" or "sometimes three times a month." (Doc. 39-2, p. 24 lines 6-9). He testified he needed to leave 1 hour early in the middle of the night (at 1:30 am) in order to drive his wife to her appointments. (*Id*. at p. 23 lines 20 through p. 24 lines 1-5). James claimed

---

[4] James objected to discovery requests seeking the dates and times of his wife's appointments and even refused to provide them after the parties conferred with the Court when FXF sought his wife's medical records. (ECF Doc. 39-13).

the appointments were regular appointments related to pregnancy and that they were scheduled at 4 am. (Doc. 39-2, p. 24 lines 6-23 and p. 25 line 1).

Importantly, James testified that if the appointments had been later in the morning, he would have no trouble working until 2:30 am and taking his wife to her appointments. (Doc. 39-2, p. 28 lines 6-9). James later admitted in sworn responses to interrogatories that none of the appointments were at 4 am and that all of the appointments were at 7:00 or 8:00 am and none were before 7:00 am. (Doc. 39-13, p. 10-11). James' amended answer to an interrogatory asking for all dates and times of James' spouse's appointments included an objection and did not provide the specifics of the appointments. (Doc. 39-13, p. 10-11). The answer goes on to state: "my wife has helped me remember that, although she wanted to be at the hospital early for the above stated reasons, her actual scheduled appointments to see the doctor would be between 7:00 am and 8:00 am." (*Id.*).

## IV.    James' Alleged Requests to Leave Work Due to Wife's Pregnancy

### A.  Week of June 22, 2020

James' allegations about the dates he needed leave are murky. In his EEOC Charge, James claimed that the week of June 22 he completed his shift and Sadiou Macalou stopped him from leaving and required him to work overtime. (Doc. 39-10, p. 3). James claimed that he told Macalou that he needed to get home to his wife because she was having complications. (*Id*). The District Court assumed June 25 as

the specific date for an alleged prenatal procedure, citing James' declaration, in which James stated it was "around" June 25. (Doc. 64, p.6, citing Doc. 44-3, ¶16). Of course, June 25 was the date James was disciplined for failing to check with his supervisor.[5]

## B.  A "Couple of Days Later"

James claimed that a "couple of days later" he was leaving after completing his scheduled shift but Macalou stopped him and told him he had to work overtime. (Doc. 39-10, p. 3). James responded that he had already worked some overtime that day and that he needed to get home to his wife who was getting more ill due to her pregnancy. (*Id*.). James refused to stay and left at his originally scheduled end time. (*Id.*). He further claims that the following evening Macalou told him he needed to write a statement as it related to job abandonment. (Doc. 39-10, p.3).

The shift that began June 30 and ended July 1 is when James again failed to check with a supervisor before clocking out and refused to provide a statement regarding his actions. James worked 8.08 hours on his shifts on 6/29-6/30 and 6/30-7/1 but clocked out at 2:17 am and 2:15 am, which was earlier than his scheduled

---

[5] Whatever date James alleges for his wife's procedure is immaterial because he refused to provide any evidence to suggest his wife had any procedures on any dates. (*See* fn. 4)

end time of 2:30 am. (Doc. 39-9 p. 127).[6] The last shift that James worked was 7/1-7/2 and he clocked out at roughly his normal time. (*Id.*). It was after this last shift that James's wife went into labor. (Doc. 44-3 p. 8 ¶ 25).

## V.    James' Non-Compliance with FXF Attendance Policy & Expectations

The FXF Attendance Policy requires that employees must not leave early without permission. (Doc. 39-7, p. 3). "If an employee leaves work early, they must have permission. If an employee leaves work early for reasons that are not pre-approved with leadership . . . the event may be addressed through the 'Conduct of Employees Policy' as a failure to follow instructions." (*Id.*). In November 2018, (18 months prior to his wife's pregnancy) James received a corrective action (coaching) for leaving work without checking in with a supervisor. (Doc. 39-19 p. 2).

During the spring and summer of 2020, the FXF Birmingham location experienced significant absences associated with COVID. (Doc. 39-8, p.64-65). As a result, and in order to maintain effective staffing and to manage the productivity of Freight Handlers, the leadership at the location began reminding employees that they were required to check-in with the Supervisor on the dock before clocking out for the day. (*Id.* at 65-66). This was to ensure all freight had been properly moved to the various out-bound trailers and to ensure work was completed before the

---

[6] Here, again, James refused to provide any evidence to suggest his wife needed any type of care that he was unable to provide or would have been unable to provide if he had remained at work. (*See* fn. 4)

subsequent shift arrived in the morning. (*Id*.).  All of the Freight Handlers were re-trained that they must check-in with a supervisor before clocking out. (*Id. and see* Doc. 39-6, p. 145 lines 7-23 through p. 146 line 1).

## VI.    James' June 25, 2020 Corrective Action (Coaching)

FXF leadership had repeatedly reminded James and all the employees for "several weeks prior" to the incidents giving rise to this lawsuit that all associates needed to check-in with a supervisor prior to clocking out. (*Id*.). James received a coaching on June 25, 2020 for refusing to work overtime and was reminded he must report to a supervisor before he leaves. (Doc. 39-11, p. 2). The coaching indicates that James told his supervisor he wanted to see the policy that stated he had to work overtime. His supervisor explained that a full-time employee is required to work overtime when needed. (*Id*.).

Beginning in November 2017 James received several corrective actions (coachings) for tardiness and unexcused absences. (Doc. 39-20, p. 2-10). In each of those coachings, he was reminded that the nature of the work requires that each employee "work the full shift and any reasonable overtime required." (*Id*.). The Pay Policy explains that "[m]anagement makes a reasonable effort to provide employees with as much advance notice as possible when overtime-eligible work is required. **Employees are expected to work all required hours**." (Doc. 39-21, p. 3). (emphasis added).

9

The employment agreement that is part of the employees application and signed by the employee also provides: "[b]usiness needs may at time require the following conditions to become mandatory; overtime, shift work, a rotating work schedule . . .." (Doc. 39-12. p. 10, Paragraph 5).

## VII.    James' Termination

While other Freight Handlers received corrective action for failing to check-in before leaving, only James violated this instruction again during this time frame. (Doc. 39-8, p. 67 lines 20-23 and p. 68 lines 1-2)  On July 1, 2020, James once again clocked out without checking with a supervisor. Operations Manager Sadiou Macalou saw him in the breakroom and asked him if he had checked in with a supervisor. James confirmed that he did NOT check-in with the dock supervisor before clocking out. James also refused to clock back in to speak with his supervisor. (Doc. 39-15, p. 264).

Operations Supervisor Tom Brewer wrote in his Statement of Incident:

"[o]n the morning of 7-1-2020 Teryl James left work without reporting to the dock stand to check in first. This is a repetitive incident with Mr. James. Last week there was even a discussion with him about how it was required to check in with the dockstand to see if we were good on work before he took it upon himself to leave."

(Doc. 39-14 p. 2). James testified that the reason he was leaving was because he felt his shift was over. (Doc. 39-3, p. 5 lines 4-21). He testified that his wife did not have

an appointment that day. (*Id*.). He wanted to go home to be with his wife because she was not feeling well.[7] (Doc. 39-3, p. 21 lines 7-13).

FXF has a written conduct policy. (Doc. 39-16, p. 2-5). Insubordination is a violation of the policy. An employee that refuses to comply with instructions from a supervisor is in violation of the policy. (*Id.* at p. 3). The Conduct policy provides that insubordination is unacceptable performance. (*Id*.at p. 2). James returned for the next shift the evening of July 1. (Doc. 39-9 p. 127). He was again asked to write a statement about abandoning his job the night before and he again refused. (Doc. 39-3, p.31 lines 18-23).

James returned to work his typical shift July 1 - July 2. (Doc. 39-9 p. 127). On July 2, after reviewing Macalou's report of the incident the morning of July 1, Rickey Albert, Service Center Manager, requested James' termination. (Doc. 39-17 p. 5). James' wife did not go into labor until July 2 after he returned home. (Doc. 44-3 p. 8 ¶ 25). James did not leave early or seek to leave early July 2. (Doc. 39-9 p. 127). James applied for leave on July 9 (after his manager had already requested termination) and it was approved. (Doc. 51-4 p. 3).

James received paid parental leave from July 6-July 17. (Doc. 51-4 p.3). John Hodge, the Employee Relations Advisor, further investigated Albert's request for

---

[7] Although his supervisors stated that James refused to provide a reason for clocking out early without checking with a supervisor, for purposes of this appeal only, FXF assumes the truth of this allegation.

termination. Hodge interviewed James on July 20, 2020, and James admitted that he knew the rule requiring him to check-in with a supervisor he and violated it. (Doc. 39-17 p. 9) On July 22, 2020, Hodge concluded that James was insubordinate and recommended that James be fired. (*Id.* at p. 4). James was terminated on July 30, 2020 for violations of the conduct policy (Insubordination – Improper Refusal to Perform Work). (Doc. 39-17, p. 3-11). Notably, James' FMLA leave began after the July 1, 2020, incident that led to his termination and ended before James was fired on July 30, 2020.

James had accumulated a quick succession of several events: 1) failing to follow directions to check-in with a supervisor before leaving; 2) violating the same directives one week after being issued corrective action; 3) and insubordination and unprofessional behavior when he refused to complete a statement explaining why he was repeatedly violating directives from his supervisors. (*Id.*).

The Termination Recap notes that Sadiou Macalou warned James that if he left without approval, it would be considered "job abandonment." (*Id.*). Despite this warning from his Manager, James left the facility. (*Id.*).

## STANDARD OF REVIEW

This Court reviews the District Court's entry of summary judgment *de novo* considering all the facts and reasonable inferences in the light most favorable to the non-moving party. *Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar*

*System Inc.*, 541 F.3d 1278, 1287 (11th Cir. 2008). A court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *Nolen v. Boca Raton Community Hosp., Inc.* 373 F.3d 1151, 1154 (11th Cir. 2004). Finally, genuine disputes of facts are "those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

The Court may affirm the district court's judgment "on any ground that finds support in the record." *Daughtery v. Mikart, Inc.*, 205 F. App'x 826, 827 (11th Cir. 2006) (*quoting Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)).

The standard of review regarding the interpretation of a court's own Orders is reviewed to determine if the court's actions constitute an abuse of discretion. The District Court's interpretation of his own orders is properly accorded deference on appeal when its interpretation is reasonable. *Cave v. Singletary*, 84 F.3d 1350, 1354-55 (11th Cir. 1996) (citing *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 921 (11th Cir. 1990). See also *Matter of Chicago, Rock Island and Pacific R.R. Co.*, 865 F.2d 807, 810-11 (7th Cir. 1988) ("We shall not reverse a district court's interpretation of its own order unless the record clearly shows an abuse of discretion. The district court is in the best position to interpret its own orders.")

13

To show an abuse of discretion, an appellant bears the burden of showing that the District Court made a clear error of judgment. *Balogh's of Coral Gables, Inc. v. Getz*, 789 F.2d 1356, 1358 (11th Cir. 1986) (*en banc*).

<u>**SUMMARY OF THE ARGUMENT**</u>

The District Court's Order granting summary judgment to FXF is well supported by law and record evidence. The District Court first had to address James' failure to controvert FXF's facts, in violation of Fed. R. Civ. P. 56(c)(1) and the court's Initial Order. The court did not abuse its discretion in finding that the facts asserted by FXF and supported by citations to the record are deemed admitted. Notably, the court also assumed that all facts asserted by James and supported by some record evidence were true—even if FXF disputes them. (Doc. 64, p. 3). James' assertion that the District Court failed to accept his properly supported contentions as true is patently incorrect.

James tried to assert a new claim in his response to FXF's motion for summary judgment, alleging that FXF failed to provide him with notice of his rights. But, this claim was not pled in his Complaint and cannot be pursued on appeal. Even if this claim had been pled, it would be viewed as a technical violation and the District Court found that James cannot point to any harm or prejudice that resulted from the technical violation of failing to provide notice of rights.

14

James claims FXF interfered with his FMLA rights. However, James fails to identify any protected right he was denied. James specifically testified that on June 25 and July 1, his wife did not have any appointments or treatments or lacked any necessary care because he was not at home. James claims that his desire to be home with his wife was an "FMLA qualifying event." But, that is not the law. In order to eligible for leave under FMLA, an employee must have a triggering event – e.g., an appointment.

James argues repeatedly in his brief that he had to leave on July 1 because his wife was experiencing a medical emergency and that is the reason he did not check with a supervisor. This is a misrepresentation and it is unsupported in the record. James reported to work the evening of July 1 (for his normal shift) and worked overnight and did not request to leave early. It was after THAT shift (ending July 2) that Mrs. James went into labor. James' request for FMLA leave for the birth of his child was granted.

The reason James claims July 1 as the date of his wife's medical emergency is because it was his conduct at the end of that shift that resulted in his termination. James failed to demonstrate any prejudice he suffered as a result of not being allowed to leave his shifts early.

James' retaliation claim also fails because he cannot show that the legitimate non-discriminatory reason for his termination was pre-text. The reality is simple.

The conduct that resulted in his termination occurred prior to James' request for leave related to his child's birth. James received a corrective action in 2018 long before his wife was pregnant and long before any claim for FMLA. In that corrective action, he was told he must check-in with a supervisor before leaving for the day. Then, on June 25, 2020, James violated the policy again and was told he must check-in with a supervisor. Only a week later after being told he could not leave without checking with a supervisor, on July 1, James clocked out and did not check-in with a supervisor. James also refused to discuss this violation with his supervisor and left the facility. James did not have any FMLA qualifying reason he had to leave earlier than 2:30 am on July 1. As a result of his repeated violations, James was terminated.

Notably, the decision to terminate James was made by Rickey Albert, the Service Center Manager, on July 2 **before** James' wife went into labor and **before** James requested leave on July 6.

The District Court correctly found that James was not qualified under the Americans with Disabilities Act for his position because he could not demonstrate that he could meet FXF's time and attendance requirements. The District Court found that James' attendance records – before and after his wife became pregnant – show a history of absences and tardies. (Doc 64 p. 18). The Court also found that James' supervisor cited this history when reporting James' refusal to speak with a supervisor on July 1, 2020. As a matter of law, the District Court correctly found that

if a non-disabled employee violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the disabled associate. James refused to comply with disability neutral policies (checking in with supervisor before leaving and working overtime when business needs necessitated), so he cannot establish an ADA violation despite his wife's condition.

In summary, the District Court did not err in granting summary judgment.

## **ARGUMENT**

### I.  **The District Court did not abuse its discretion in determining Plaintiff failed to comply with the Federal Rules of Civil Procedure and the Court's Orders.**

Fed. R. Civ. Proc. 56 (c) (1) requires "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . ."  In addition, the district court's Initial Order requires that the non-movant's response contain individually numbered, concise, non-argumentative responses corresponding to each of the movant's enumerated material facts. (See Doc. 64 p. 2).

James did not comply with Rule 56 and the Court's Initial Order. The District Court found that where a party responding to a summary judgment motion does not directly refute a material fact set forth in the movant's Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact such fact is deemed admitted by the respondent. (Doc. 64 p. 3).

When reviewing a District Court's interpretation of its own Orders, the Court of Appeals gives "great deference to a district court's interpretation of its local rules" and reviews a district court's application of local rules for an abuse of discretion. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302-1303 (11th Cir. 2009) (citing *Clark v. Housing Auth. of Alma*, 971 F.2d 723, 727 (11th Cir. 1992). In order to meet the abuse of discretion standard, Plaintiffs bear the burden of showing that the district court made a clear error of judgment. *Mann,* 588 F.3d at 1302. (citing *Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356, 1358 (11th Cir.1986) (*en banc*)).

James argues that while he did not technically comply with the Court's Order, he did controvert some of FXF's facts with citations in the body of his response. In *Mann*, the plaintiff in that case had similarly failed to comply with the Court's Local Rule that provides the same requirements for a non-movant as the District Court's Initial Order in this case. The Court held, "Plaintiffs failure to comply with local rule 56.1 is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case." *Mann*, 588 F.3d at 1303 (citing *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008).

FXF pointed out this failure by James in its Reply and the District Court permitted James to file a sur-reply, yet James still did not correct his response to FXF's Statement of Facts. (Doc. 64 p. 3). James was "on notice of the deficiency and took no steps to make corrections" just like the plaintiff in *Mann*. *Id.* Because

18

James failed to comply with the Court's Order, the "only permissible way for it to establish a genuine issue of material fact at that stage--the court has before it the functional analog of an unopposed motion for summary judgment." *Mann*, 588 F.3d at 1303 (*citing Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)).

The District Court held that because of James's noncompliance, the Statements FXF's Statement of Material Facts were assumed to be true. (Doc. 64 p. 3). However, the District Court also assumed the truth of James' properly supported citations to the record to determine if there were indeed, no genuine issues of material fact. *Id.* Because the District Court was interpreting its own Order and the requirements of Fed. R. Civ. Pro 56(c), when determining that the facts provided by FXF were deemed admitted, James must show that the District Court made a "clear error of judgment." *Balogh's of Coral Gables, Inc.*, 798 F.2d at 1358. James cannot demonstrate such error and there was no abuse of discretion.

James assertion that the District Court did not accept his properly supported contentions as true is simply incorrect. For example, the District Court assumed James informed management that his wife's pregnancy was high risk, that he had to leave for his wife's prenatal procedure, and that she had a "serious health condition" that required James to drive his wife to the hospital because she was unable, and to go home to care for her if needed. (Doc. 64, pp. 6, 19). However, James cannot cite

to any **properly supported, accurate, material** allegations that the District Court
disregarded.

## II.    James cannot defeat summary judgment by asserting new claims not pled in his complaint.

In his summary judgment response, James raised for the first time an alleged
failure to comply with certain FMLA notice provisions. James alleges that FXF was
obligated to provide an employer's notice of rights and responsibilities under the
FMLA to James. In fact, James states that this entire dispute stems from this alleged
failure. However, such an interference claim has never been pled and could not be
raised for the first time in response to a motion for summary judgment. See *Hurlbert
v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Gilmour
v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

The District Court determined that it did not need to decide whether James
failed to plead this claim and is thus barred from doing so. The District Court held:
"FXF argues that James failed to plead this 'failure-to-notify' theory in his
complaint. The Court tends to agree (and thus the argument is preserved), but it
needn't decide the waiver issue because James cannot prove that the alleged failure
prejudiced him." (Doc. 64 fn. 2.). It is clear, even though the District Court did not
explicitly rule on this issue, that James did not assert this claim and should be barred
from doing so at this point. This Court may affirm the district court's judgment "on

any ground that finds support in the record." *Daughtery v. Mikart, Inc*., 205 F. App'x 826, 827 (11th Cir. 2006).

In *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1199-1200 (11th Cir. 2015), the Court addressed the issue of an unpled notice claim. Ms. White filed suit under FMLA and, in response to the Defendant's Motion for Summary Judgment, claimed that her employer had failed to provide notice of her Rights under the FMLA. *Id.* at 1199-1200. The District Court in *White* refused to consider the "Employer Notice" claim because it had not been pled despite the fact that the plaintiff alleged an FMLA Interference claim. *Id.* The Eleventh Circuit agreed with the district Court and held that, despite the liberal pleading standard, "plaintiffs may not 'raise new claims at the summary judgment stage.'" *White*, 789 F. 3d at 1200 (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)). Furthermore, "at the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint." *White*, 789 F.3d at 1200. A plaintiff "may not amend her complaint through argument in a brief opposing summary judgment." *Id.*

A subsequent assertion of an additional, separate statutory basis for FMLA interference effects a fundamental change in the nature of plaintiff's interference claim. *Hurlbert*, 439 F.3d at 1296. The Eleventh Circuit held "[h]aving proceeded through discovery without amending (or seeking to amend) his complaint to reflect

that fundamental change, [the plaintiff] was not entitled to raise it in the midst of summary judgment. *Id*.

James never raised this Employer Notice claim in his Complaint. James now claims that the "Employer Notice is the fundamental dispute between the parties." (Doc. 45 p. 4). This is the exact scenario that the Court rejected in *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188 (11th Cir. 2015). Accordingly, the Court should not consider this claim regarding employer notice and should not consider evidence or testimony regarding this new unpled claim when considering whether Summary Judgment is proper on the claims. As discussed further below, even if this Court considers the claim, the District Court did not err in finding that James suffered no prejudice.

## III. The District Court properly held that there was no genuine issue of material fact regarding James' FMLA Claims.

### A. James cannot show entitlement to FMLA leave prior to the birth of his child.

James bears the burden to show that he was entitled to leave. "The employee cannot merely demand leave; he must give the employer a reason to believe that he is entitled to it." *Cruz v. Publix Super Mkts., Inc*., 428 F.3d 1379, 1385 (11th Cir. 2005).

James argues that both instances when he wanted to leave early June 25 and July 1 were "FMLA qualifying events." To the contrary, James admitted he did not

need to leave early for his wife's appointments. Indeed, on the morning of June 25, 2020 and July 1, 2020, James admitted his wife did not even have an appointment. (Doc. 39-3 p. 5 lines 15-21). In order to receive FMLA protections, "an employee must be both eligible, meaning having worked the requisite hours, and entitled to leave, meaning **an employee has experienced a triggering event**." *Sparks v. Sunshine Mills, Inc.*, 580 Fed. Appx. 759, 766 (11th Cir. 2014). In this case, a triggering event would be an actual need to take his wife to her appointments because she was "incapacitated," at least according to James. However, there is no properly supported evidence to suggest she was incapacitated during the relevant time frame for purposes of FMLA-qualifying leave.

James has failed to produce any evidence to even suggest that he had to assist his wife in getting to her appointments or caring for herself. In fact, if she was truly incapacitated, he would not have been able to work at all. He can point to no appointments that his wife missed because he was not available to take her as a result of remaining at work. James cites no evidence of any harm or lack of care resulting from not being allowed to leave when he wanted to because of his wife's pregnancy.

Moreover, the need to leave early on a few occasions does not establish entitlement to leave under the FMLA. *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1434-36 (11th Cir. 1997). In other words, James' assertion that he may need to leave his shift due to his wife's high-risk pregnancy without any proof she actually missed

23

appointments or that James was unable to provide necessary care for her is insufficient to demonstrate that he needed to leave work, particularly without checking in with his manager.

In short, James was not attempting to leave because of an FMLA qualifying event, he simply wanted to be home with his wife. (Doc. 39-3, p. 3-5). The record is clear that James' claimed reason to leave work had nothing to do with caring for his wife due to incapacitation or driving his wife to her appointments that occurred at 7:00 and 8:00 am.

### B. FXF did not interfere with James' Rights under the FMLA or engage in retaliation.

The Eleventh Circuit has recognized two types of claims under the FMLA:

> "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).

To demonstrate interference, the employee must show that her employer interfered with or denied him an FMLA benefit to which he was entitled. *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353 (11th Cir. 2000). To establish retaliation, an employee has the "increased burden" of demonstrating that her employer intentionally discriminated against him for exercising a right guaranteed

24

under the FMLA. *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267–68 (11th Cir. 2008).

Notably, on the single occasion that FXF acknowledges James requested FMLA leave for his wife's pregnancy, it was granted, effective July 6, 2020. (Doc. 39-4, p. 12 lines 18-20). James's allegation that FXF interfered with his FMLA rights by requiring him to check-in with a supervisor before leaving is not interference. The requirement is merely supervision of the Freight Handlers to ensure safety, adequate coverage, and to maintain productivity and timeliness guidelines. The requirement for all Freight Handlers to check-in with a supervisor was universally applied and had been put in place months before James claims that he informed FXF that his wife had a "high risk" pregnancy. This work requirement to check-in with a supervisor before leaving "shows that the . . . decision was 'wholly unrelated' to [her] request for medical leave." *McCarroll v. Somerby of Mobile, LLC*, 595 Fed. Appx. 897, 900 (11th Cir. 2014) (granting summary judgment on Plaintiff's FMLA interference and retaliation claims). The District Court properly dismissed James's claims for FMLA interference and retaliation based upon FXF's requirement to check-in with a supervisor before leaving.

James now claims on appeal that his wife was communicating with him during his shift on June 30-July 1 that she was in pain and he needed to get home to drive his wife to the hospital. (Appeal Doc. 16 p. 8-9). However, James misrepresents the

record and his own sworn statement which states that his wife went in labor on July 2. (Doc. 44-3 p. 8 ¶ 25). James repeatedly argues that he had to leave work early because his wife was "**experiencing a medical emergency**" and needed him at home. (Appeal Doc. 16 p. 35). (emphasis in original). Yet James also admits he did not have any FMLA-qualifying reason to get home the morning of July 1 (Doc. 39-3 p. 6 lines 21-23 through p. 7 line 1). He worked his next shift July 1-2 and after THAT shift is when his wife went into labor. (Doc. 39-9 p. 127; Doc. 44-3 p. 8 ¶ 25). James' time records also show he clocked out as normal the morning of July 2. (Doc. 39-9 p. 127). Hence, James' representation that he told his manager he had to get home the morning of July 1 because his wife was having an emergency is patently untrue and should be disregarded by this Court. The actions that led to James' termination occurred the shift before June 30-July 1 when James testified he did not have a specific reason to be home. (Doc. 39-3 p. 6 lines 21-23 through p. 7 line 1).

### C. Any alleged interference with time off was a technical violation and did not prejudice James.

Even assuming James's alleged statement to his supervisor about his wife's high-risk pregnancy should have triggered any duties under the FMLA, James cannot show any prejudice or that he suffered damages for any alleged interference. A plaintiff can recover damages under the FMLA for "any wages, salary, employment benefits, or other compensation denied or lost . . . by reason of the violation," or for "any actual monetary losses sustained . . . as a direct result of the

violation." *Id*. § 2617(a)(1)(A)(i) (emphasis added). The Supreme Court has thus made clear that "[section] 2617 provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002). The Eleventh Circuit has held that "[e]ven if the defendant[] ha[s] committed certain technical infractions under the FMLA, [the] plaintiff may not recover in the absence of damages." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999).

First, as explained above, James' stated reason for needing to leave early was not true. Even if it had been true, he did not, and cannot, show that he missed any appointments with his wife or that he was prejudiced in any way. Second, James failed to present any evidence of **any** harm he sustained even if he could produce evidence of any time that FXF did not permit him to leave early enough to make his wife's appointments or care for his wife.

The District Court analyzed James' interference claim into two distinct time periods – Post-birth and Pre-birth. (Doc. 64 p. 19). Because James sought and was granted leave, the Court correctly held that "no reasonable juror could find that FXF interfered with James' FMLA rights" after his wife went into labor. (Doc. 64 p. 19). When James learned that his wife was in labor and his baby was born, James requested leave under FMLA and FXF granted it. In other words, James requested leave and used it, therefore there is no interference "post-labor." (Doc. 64 p. 19).

The District Court also correctly held that James must show interference before July 2 for "pre-labor" interference. The Court held that James could not link any "alleged interference to any missed appointments, missed emergencies, or any other prejudice." (Doc. 64 p. 20). He cannot show that FXF's actions prevented James from driving his wife to her pre-labor appointments or caring for her in an emergency. (*Id.*). James would not even provide any evidence of any dates or times that he had to be home to drive his wife to an appointment. Furthermore, the Court held that "no reasonable juror could find that requiring James to check-in with a supervisor when his shift ended around 2:30 am prevented James from taking his wife to 7:00 am (or later) appointments." (Doc. 64 p.20).

James argues on appeal that *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233 (11th Cir. 2021) supports his argument that he was prejudiced by the interference with his rights because he was terminated. James argues that because FXF had not provided notice of rights to James when he stated he would have to leave on occasion to take his wife to appointment is itself evidence of prejudice to show FMLA interference. This argument fails for several reasons. First, as already noted, James did not assert an "Employer's Notice" claim. Second, James failed to produce any evidence of any appointments, procedures or any other FMLA qualifying reason to leave work without checking with a supervisor on June 25 or July 1. Third, the Plaintiff in *Ramji* was able to show actual prejudice – because the

28

employee did not know she could take time off from work, she exacerbated her injury by returning to work too soon, which resulted in her termination for failing to pass the essential functions test. (*Id*. at 1246). Here, in contrast, James simply was not prejudiced because he cannot show he actually needed the pre-labor leave. In addition, he knew he could apply for leave, as evidenced by the fact that he applied for leave for the birth of his child.

On appeal, James argues that FXF should have retroactively applied leave under FMLA to cover the shift where James failed to check-in with a supervisor. (Appeal Doc. 16 p. 31). However, James testified he did not have any appointment or any specific reason he needed/wanted to be home early on the morning of July 1. Essentially, there was no event that would trigger leave under FMLA at 2:30 am on July 1 even if FXF had wanted to retroactively apply leave. As soon as James requested leave on July 7 for his child's birth, FXF granted it and made it retroactive to July 6.

IV. **The District Court properly held that there was no genuine issue of material fact regarding whether FXF disciplined James because of an anti-FMLA leave motive or intent.**

The District Court held that even if the series of events claimed by James (that he was unfairly targeted and subsequently terminated), amounts to actionable retaliation, James failed to offer evidence that would allow a reasonable juror to find that FXF disciplined James "because of an anti-FMLA leave motive or intent."

29

(Doc. 64 p. 22). (citing *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001).

The District Court held that FXF enforced the check-in and overtime requirements on all similarly situated freight loaders and undisputed evidence shows that other similarly situated freight loaders worked more overtime than James. (Doc. 64 p. 22). The undisputed evidence also shows that FXF disciplined James for leaving without checking-in with a supervisor before and after his wife became pregnant. (*Id*.).

The District Court's analysis is correct. FXF had been training all freight handlers that they must check-in with a supervisor before clocking out. (Doc. 39-8, p. 64-65). James had been warned about this requirement as early as 2018 and subsequently on June 25, 2020. In fact, while other Freight Handlers had violated this requirement, only James violated it again. (Doc. 39-8 p. 66). Because of this, the District Court found that no reasonable juror could find James' discipline for leaving early was motivated by an anti-FMLA leave bias.

James argues that the check-in policy was not universally applied and that Tom Brewer, an FXF supervisor, did not confirm that other employees leaving the morning of July 1, 2020 had checked in with a supervisor before leaving. James argues because of this, the District Court failed to consider if the policy was applied fairly. In fact, James argues that Tom Brewer "admitted to lying in his deposition

and that he had no personal knowledge of Mr. James leaving without checking in."
(Appeal Doc. 16 p. 23). This is a gross misstatement. Brewer testified specifically
that he was working the dock stand on July 1, 2020 and that he had personal
knowledge that James did not check-in with him before clocking out. (Doc. 39-6 p.
133 lines 12-23 and p. 132 lines 1-3).

**V.      James cannot show that FXF's legitimate, non-discriminatory reason for
termination was a pretext for retaliation.**

Even assuming James can establish the prima facie elements of FMLA
retaliation, he cannot show that FXF's reason for terminating him was not legitimate
or non-discriminatory and he cannot establish pretext. To succeed on this claim,
James must demonstrate that FXF "intentionally discriminated against him in the
form of an adverse employment action for having exercised an FMLA right." *Jones
v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017)
(citing *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199,
1207 (11th Cir. 2001)). In other words, James must show "that his employer's actions
'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id*.
(quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)).

To show pretext, James must "come forward with evidence, including the
previously produced evidence establishing the prima facie case, sufficient to permit
a reasonable factfinder to conclude that the reasons given by the employer were not
the real reasons for the adverse employment decision." *Chapman v. AI Transp*., 229

F.3d 1012, 1024 (11ᵗʰ Cir. 2000). But James cannot show that FXF's proffered reasons for terminating him were pretextual simply by "quarreling with the wisdom" of those reasons. See *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

The Eleventh Circuit recently held that the proper causation standard for FMLA retaliation claims is "but-for causation." *Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023). The task then is to determine whether James has raised any triable issue of fact as to his retaliation claims in light of the but-for causation standard. *Id*. (citing *Flowers v. Troup County*, 803 F.3d 1327, 1336 (11th Cir. 2015)).

According to the Court, but-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020). Thus, the but-for test "directs us to change one thing at a time and see if the outcome changes." *Id*. If it does, the isolated factor is a but-for cause. And if it does not, the isolated factor is not a but-for cause, and all of the other factors, taken together, are sufficient. *See id*.; see also *Burrage v. United States*, 571 U.S. 204, 211 (2014) (describing a but-for cause as a "straw that broke the camel's back").

Hence, James must produce sufficient evidence showing that FXF's proffered reasons for his termination were merely pretext for retaliation and that, *but for* the retaliation, FXF not would have fired him. First, the decision to terminate James was

made prior to his request for leave and the District Court correctly found there is thus no connection between James' exercising his right to leave and his termination.

James argues that *Herren v. La Petite Acad., Inc.*, No. 22-11499, 2023 U.S. App. Lexis 19524, 2023 WL 4842346 (11th Cir. July 28, 2023) is similar to the present case. In *Herren*, the Court reversed the district court finding that the employer could not show that the employer would have been terminated for a reason wholly unrelated to her request for FMLA. *Herren*, 2023 U.S. App Lexis 19524 at *9. However, this case is not similar because in that case a question remained about when the supervisor made the decision to terminate the employer. In this case, the District Court correctly found that Ricky Albert (the Service Center Manager) sought James' termination on July 2 **before** James' wife went into labor and **before** he requested leave. (Doc. 39-17 p. 5).

The District Court properly concluded that FXF sought to terminate James **before** his wife went into labor and before he requested leave for the birth of his son. James now argues that there is no evidence that FXF made the decision to terminate before James requested leave. This is not accurate as the District Court properly found because Albert, the Service Center Manager, requested James' termination on July 2. (Doc. 64 p. 21). James did not request leave under FMLA until July 6/7. James argues that John Hodge, the Employee Relations Advisor, terminated James on July 22. The evidence is clear, however, that the Service Center Manager had

already requested termination **and** Hodge testified that employee relations advisors do not make the decision to terminate employees. (Doc. 39-17 p. 5 and Doc. 39-8 p. 62 lines 1-8). Hodge conducted further investigation and recommended James' termination, in accord with Albert's request.

In addition, FXF has a wholly independent justification for James' termination – i.e., repeatedly failing to check-in with a supervisor despite a warning seven days earlier. The Eleventh Circuit Court of Appeals has made it clear that an employee's violation of company rules constitutes a legitimate, non-discriminatory reason for an adverse employment action. *See, e.g., Taylor v. On Tap Unlimited, Inc.*, No. 07-14493, 2008 U.S. App. LEXIS 13543 (11th Cir. June 24, 2008) (firing plaintiff/waitress for entering a tip twice on customer's credit card, in violation defendant's employee policies was a legitimate, non-discriminatory reason); *Arnold v. Tuskegee Univ.*, No. 06-11156, 2006 U.S. App. LEXIS 31476 (11th Cir. Dec. 19, 2006) (repeatedly submitting time sheets that failed to conform with the defendant's regulations, among other things, was a legitimate, non-discriminatory reason for termination).

James refused to follow directions to check-in with a supervisor before clocking out and leaving. In addition, James had been issued corrective action for this exact conduct only one week before. (Doc. 34-11, p. 2). James's termination had everything to do with his failures to follow directives from his supervisors as

indicated in the Termination Recap – he was repeatedly warned that he must check-in with a supervisor before leaving. (Doc. 34-17, p. 3).

As demonstrated above, James has failed to meet the "but for" standard to show that a reasonable juror would find that he would not have been terminated "but for" the retaliation. James has failed to "meet [FXF's justifications] head on" and meaningfully rebut them. *Alvarez v. Royal Atl. Devs*., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*)).

## VI. The District Court properly held that James was not qualified for the job at the time of his termination.

James claims that he was discriminated against because of his association with his wife who was pregnant at the time. In order to establish a prima facie case of associational discrimination, a plaintiff must show that: (1) he was subjected to an adverse employment action, (2) he was qualified for the job at that time, (3) he was known by the employer at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in the employer's decision.[8]

*Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999).

---

[8] In his response to FXF's Motion for Summary Judgment James argues that he has not asserted a Termination claim under the ADA. (Doc. 45 p. 43). Presumably, James is arguing only that the June 25, 2020 coaching is the adverse employment action to which he was subjected.

The District Court found that James cannot establish the second factor -- that he was qualified for the job at the time of his dismissal. (Doc. 64 p. 17). In order to be qualified for the job an employee associated with a disabled person must nonetheless be able to meet the employer's time and attendance requirements. *Hilburn*, 181 F.3d at 1231. The District Court held that "failure to meet the attendance requirements of [the] job mean[s] that [the employee is] not a qualified individual . . . ."). (Doc. 64 p. 17 (*citing* Hilburn 181 F.3d at 1231)).

When analyzing James' claim, the District Court held that "to be a qualified individual under the ADA, a person must be able to perform the essential functions of her job with or without reasonable accommodation." *Id*. (citing *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001)).

Because regular attendance is an essential function of most positions, including at FXF, James could not establish that he was qualified. *Jackson v. Veterans Admin.,* 22 F.3d 277, 279 (11th Cir. 1994) (employers are entitled to expect regular and predictable attendance at work, which is an essential function of most jobs). James argues on appeal that he was not disciplined for failure to comply with attendance policies. However, James was terminated because he failed to check-in with a supervisor before leaving and for refusing to work overtime when needed. (Doc. 34-17, p. 3). The FXF Attendance Policy also specifically provides that employees must not leave early without permission. (Doc. 39-7, p.3).

36

James also argues that FXF failed to present any evidence that the policy requiring employees to check-in with a supervisor was applied consistently to other employees. This argument fails for two reasons. First, FXF presented evidence that all employees were required to check-in with Supervisors and all Freight Handlers were re-trained that they must check-in with a supervisor before clocking out. (Doc. 39-8, p.64-66) *and see* Doc. 39-6, p. 145 lines 7-23 through p. 146 line 1). Second, FXF presented evidence that other Freight Handlers received corrective action for failing to check-in before leaving, only James violated this instruction again during this time frame. (Doc. 39-8, p. 67 lines 20-23 and p. 68 lines 1-2).

James admitted under oath that his claim that he needed to leave at 1:30 am in order to take his wife to 4 am appointments is false. (Doc. 34-13 p. 11). He admitted that the appointments were at 7:00 or 8:00 am and he would not have needed to leave early for appointments at that time. (Doc. 39-2, p. 28). James cites no other reason for needing to leave early in relation to his wife's pregnancy other than just wanting to be with her. Therefore, his admission of dishonesty and attempt to leave work early for a false reason is evidence that James was violating his employer's attendance policies (as well as the conduct policy in being dishonest about his need to leave work early). Moreover, James had been issued corrective action and repeatedly coached about checking with a supervisor before clocking out.

James cannot show he was a qualified individual for the purposes of an ADA associational disability discrimination claim. Not only did James violate his employer's rules about checking with a supervisor before completing his shift but his admission during this litigation that he did not need to leave early for his wife's appointments compounds his disqualification. Thus, he is unable to establish a prima facie case because he was not qualified for the position.

The Eleventh Circuit has previously held "if [a non-disabled employee] violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]." *Hilburn* 181 F.3d at 1231 (quoting *Hartog*, 129 F.3d at 1083). It follows that even if FXF terminated James because he had to leave early occasionally this would not violate the associational discrimination provision of the ADA. The District Court properly found that James could not show that he was "qualified."

## **<u>CONCLUSION</u>**

The District Court properly found that James failed to comply with its own order and failed to comply with Fed. R. Civ. Pro. 56(c). Even though the Court found that FXF's Facts were deemed admitted, the District Court did assume all facts asserted by James and supported by some record evidence were true. The District Court's Order granting summary judgment was proper because James failed to offer counter evidence that would allow a reasonable juror to find that FXF interfered with

James' FMLA rights that resulted in prejudice or that James was subjected to retaliation for asserting his rights under the FMLA. The District Court also properly found that James was not "qualified" under the ADA.

Dated: February 7, 2025.

Respectfully submitted,

/s/Donald H. Snook
Donald H. Snook

*Counsel for FedEx Freight, Inc.*
Federal Express Corporation
8285 Tournament Drive
Memphis, Tennessee 38125
Telephone: (901) 434-3183
donald.snook@fedex.com

## **CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of FED. R. APP. P. 32(a)(7) because this document contains 9,698 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6). I prepared this brief in Times New Roman font and used 14-point type.

Dated: February 7, 2025.

/s/ Donald H. Snook

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

/s/ Donald H. Snook